# JAMES Y. BONSAL

## *vs.*

# HENRY KARCZ.

### *Assumpsit—Evidence.*

In an action of assumpsit to recover money alleged to have been paid for whiskey illegally sold to plaintiff, *held* that the evidence failed to show that defendant sold any whiskey, or that he made any sale whatsoever to plaintiff.  pp. 434-439

One who pays for an article, which is not, however, delivered to him by his vendor, cannot sue one from whom such vendor purchased the article, merely because the latter paid the original vendor therefor.  p. 440

*Decided January 12th, 1923.*

Appeal from the Baltimore City Court (DAWKINS, J.).

Action by Henry Karcz against August Gerecht, Thomas M. Harrington and James Y. Bonsal. Judgment for plaintiff against the two defendants last named, and defendant Bonsal appeals. Reversed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*R. Contee Rose,* with whom were *Preston & Field* on the brief, for the appellant.

*Lawrence S. Kaufman* and *William Curran,* submitting on brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee sued August Gerecht, Thomas M. Harrington and James Y. Bonsal, in an action of assumpsit, the declara-

tion containing the common counts. The amended account, on which the case was tried, is as follows:

"March, 1920—To cash received by August Gerecht, Thomas M. Harrington and James Y. Bonsal, defendants, from the plaintiff, Henry Karcz, as purchase money for twenty-five cases of whiskey, and promised by defendants to be returned to plaintiff on his disaffirmance of agreement...........$2,250.00

"Credit, dividend from receivership.... 562.50

$1,688.50."

The suit was originally brought in August, 1920. On the 11th day of April, 1922, a jury was sworn, and the same day the above amended account was filed. The plaintiff submitted in open court to a judgment of *non pros.* as against August Gerecht, after instructions granted by the court, and on the same day a verdict in favor of the plaintiff for the sum of $1,688.50 was rendered against Harrington and Bonsal. A motion for a new trial and also one in arrest of judgment were filed by Bonsal. Judgment on verdict absolute was entered 13th April, 1922, against Harrington, and on the 17th of June, 1922, the motions of Bonsal for a new trial and in arrest of judgment having been overruled, judgment was rendered on the verdict against him. This appeal was taken from that judgment by Bonsal.

It is difficult to understand upon what theory the appellant could be held liable to the appellee under the facts in this record. Neither the appellee nor Bochenski, who was with him at the time of the purchase, and purchased some whiskey for himself from the same seller, claims that it was purchased from Bonsal, but on the contrary their testimony tends to show that it was not. The appellee swore that he did not have any dealings with him, and he did not know him. Bochenski testified that he did not know him at that time, although he did have a suit against these same defendants for a balance of $800 which he claimed they owed for the trans-

action at the same time, but the opinion of this court, in
*Harrington* v. *Bochenski,* reported in 140 Md. 24, shows that
a verdict was rendered for Gerecht and Bonsal in that case,
under instructions of the court. A judgment against Har-
rington for the balance due by him was affirmed—he having
paid Bochenski $2,800 out of $3,600 received from Bochen-
ski, before that suit was brought, on a purchase of whiskey
made by him from Harrington. The whiskey was appar-
ently bought by this appellee, according to the evidence in the
record, from Harrington, although some of the evidence of
the plaintiff tended to show it was from Gerecht. It is not
even claimed by Harrington that it was bought by the plain-
tiff from Bonsal, although in the face of a receipt in the
record, given by Harrington's attorney, with his knowledge
and consent—it having been read to him over the telephone
after it was written—some statements were made by Har-
rington in the teeth of that receipt, written by a responsible
and intelligent attorney, who still represented him at the
trial.

There is not the least foundation in the record for any
claim that Bonsal did sell whiskey to the appellee, or that
he was in any way connected with such sale. In the appellee's
brief, one of the headings under "Law of the Case" is, "No
question of agency is involved," and there is certainly no
legally sufficient evidence to sustain the statement in that
brief that "Bonsal and Harrington were partners for profit
in a scheme to defeat the Volstead Act," or that Bonsal's
"connection with the conspiracy is made known and it is
shown that he actually received and now retains the whole of
the appellee's money." The only pretence for that is that
when Harrington was on the stand, having been called by the
plaintiff, he was asked if he had the $2,250 paid by the
plaintiff, and he replied, "No, sir," and when asked "Who
has it?" answered, "Mr. Bonsal." Later he said, "I gave it
to Mr. McNeil and he gave it to Mr. Bonsal, and I have the
receipts here for it, for every dollar of it, if you wish to show
these receipts to the jury you can do it." He said, in answer

to the question, "What are these three papers?" "They are receipts from William J. McNeil," and was asked "Receipts from William J. McNeil?" and answered, "Yes, sir; for the amount of money he received from me for Mr. Bonsal." After an exception to that question and answer, Harrington was asked: "In whose handwriting are those three papers?" and replied, "Mr. McNeil." The attorney for Bonsal asked that that portion of the answer be stricken out which relates to Mr. Bonsal, and the court said: "This does not purport to be for money paid over to Mr. Bonsal. If he gave any receipts at the time which show that, those receipts might be admissible."

Mr. Dickerson, attorney for Harrington, said: "If it is followed up by any evidence to connect these receipts with Mr. Bonsal it is proper," but the court said: "These receipts so far do not seem to be connected with Mr. Bonsal. For that reason I think the objection should be sustained. You connect them and I'll change that ruling." The witness said again that those three papers are in the handwriting of William J. McNeil, and that "Mr. McNeil brought the receipts for sixty thousand dollars from Mr. Bonsal." Harrington said he had turned over about $70,000 to McNeil. The court then said: "Did I understand you a minute ago to say that you gave the money to Mr. Bonsal?" and the witness answered, "No, sir, I gave it to Mr. McNeil." When Mr. Kaufman, attorney for the plaintiff, said he would like to offer those three receipts in evidence, which, if he ever did, are not in the record, the court said: "They are signed by William J. McNeil," Mr. Kaufman then said that he was going to follow them up and show an admission on the part of Bonsal that he received this $70,000, when the witness interrupted, "Sixty thousand dollars." The witness said that McNeil gave him those receipts, and he gave him the money at the time he gave him the receipts. Again Harrington was asked whether he knew of his own personal knowledge that that money went to McNeil, and replied, "No, sir; it went to Mr. Bonsal," and when asked if he knew it of his own personal

knowledge, said, "Yes, sir; I had the receipt in my hand." He was asked, "Is that the way you know it?" and replied, "Yes, sir; I had the receipt in my hand." He said again that he gave about $71,000 to McNeil, the amount represented by the receipts, and again said he knew that McNeil gave the money to Bonsal and said, "I saw him give the money," but he finally admitted that he only saw him give $10,000, and he only knew anything about the rest by the receipt he claimed to have seen. We suppose that no such receipt was produced, as it is not in the record. He admitted that he knew that Bonsal had given Mr. Dickerson, his attorney, $9,500 back and also gave him the certificates. He also admitted that he knew that the receipt given by Mr. Dickerson was for certificates and he finally said that the certificates were turned over to Mr. Dickerson as a settlement.

The case, as presented by the record, is that Bonsal claims he sold certificates for whiskey in bond in a government warehouse, while Harrington swore that he (Harrington) purchased whiskey, and not certificates. Harrington, or Harrington and McNeil, paid Bonsal $60,000. Just what McNeil's connection with the purchase of the whiskey or certificates, as the case may be, is not very satisfactorily shown, but in Harrington's cross-examination it appears that McNeil told him "that we could make some money." "Q. That we could make some money? A. Yes. Q. Meaning by whom, we? A. He and I." Bonsal testified that "Mr. McNeil brought Mr. Harrington into my office at another time and said: 'This is the gentleman that wants to buy certificates.' The matter was discussed and Mr. Harrington made a tentative agreement to buy certificates representing three thousand cases of whiskey in bond. I told Mr. Harrington that that was a very large purchase for an individual, and I wanted it clearly understood that while it was all right for me to sell certificates, I did not want to do business with a group of men. I wanted one man. Mr. Harrington took a package out of his pocket in here (indicating). It was wrapped up in paper and threw it on my desk. He says, here is a pre-

liminary payment of $10,000 to apply on the purchase of those three thousand cases. He says, this is Tuesday, he said, Thursday I will send the balance of the money up to you. After we talked the thing over again, I said you can get your whiskey if you live up to the terms of your permit. If you violate those terms you are liable to get into serious trouble, and I gave Mr. Harrington a receipt for $10,000. It reads, received of Thomas M. Harrington $10,000 on account of purchase price of certificates representing three thousand cases of whiskey in bond. That is all the money Mr. Harrington ever gave me personally." He said he never knew Karcz, Bochenski or anybody excepting Harrington and McNeil; that subsequently that order was cancelled and reduced to certificates for 1,500 cases at $40 per case. There were two payments afterwards which, including the $10,000, amounted to $60,000, but as there were $4,800 of bad checks it was reduced to 1,231 cases. He said he refunded $9,500 because if there could be any honest difference of opinion as to what was said, or what he did, he was willing to divide up any profit. Mr. Dickerson, representing Harrington, and Mr. Preston, representing him, had several interviews, and finally a man named Kramer and another man, whose name he did not recall, demanded the certificates and he said, "I won't give them to you until it is done in such manner as will clearly show just what you bought, there has been so much misrepresentation that I am going to have it done right." He got the certificates, which it is stated he kept at the time he sold them at McNeil's request, went to McNeil's office and they waited until Mr. Dickerson came. A paper was then drawn up by Mr. Dickerson as follows:

"Baltimore, Md., April 30, 1920.

"Received of James Y. Bonsal the following certificates for whiskey in bond:

"Certificate No. C-108 on Frensdorf and Brown Distillery, for 500 cases;

"Certificate No. C-107 on Frensdorf and Brown Distillery, for 500 cases;

"Certificate No. C-117 on Frensdorf & Brown Distillery, for 100 cases;

"Certificate No. 109 on Frensdorf & Brown Distillery, for 171 cases;

in settlement of sixty thousand dollars ($60,000.00) purchase, hereby declaring that the above is in full settlement of a sale of certificates for whiskey in bond alone, and no representation other than the sale of certificates has been made, and no promises or agreements other than the sale and transfer of whiskey certificates are now or have been involved in this transaction between the parties hereto and the said James Y. Bonsal.

"(Signed)    Edward T. Dickerson,    (Seal)

Attorney for Purchaser.

"Witness:

"(Signed) Mark O. Shriver, Jr."

Bonsal testified that during the drawing up of the release, Harrington was telephoned to several times from the office, and the terms of that agreement as to what he bought were gone over, and as we have seen above, Harrington admitted that. There is, therefore, no question about that paper being drawn by Harrington's attorney, and approved by Harrington. The certificates were turned over to Harrington's attorney, and the above receipt taken. Harrington testified: "What became of the whiskey certificates, did you get them? A. No, sir; they were put in Mr. Lyons' hands and Mr. Lyons turned them over to a man named Kramer, and he sold them to a man over here in the Munsey Building. Q. Did you have any thing to do with the sales of the whiskey certificates? A. No, sir. Q. Kramer was the man who went down to the custom house and got a permit to open a drugstore or something of that kind, to handle these $70,000 worth of whiskey, didn't he? A. I never knew Mr. Kramer." Who Mr. Lyons was, or what his connection with the transaction was, is not explained. It is not denied by Bonsal that he received originally $60,000—sometimes spoken of as $70,-

000—but Harrington corrected the statement when he was on the stand, and said it was $60,000. According to Harrington, he and whoever were with him collected $130,000 from saloon keepers, and he claims to have paid back to them much more than $60,000. It is not pretended, unless by his careless handling of what occurred, that any of the plaintiff's money was in Bonsal's hands. It would be impossible for any one to truthfully say it was, if the record is correct, unless accounts were kept showing where the money came from that Harrington said he paid back to saloonkeepers and others. The only possible excuse for Harrington's statement that Bonsal had the money of the people he took to Bonsal's office was that he or he and McNeil paid $60,000 to Bonsal, and while he asserted several times that he knew that Bonsal had the plaintiff's money, his cross-examination and other statements in the record showed conclusively that he did not know anything of the kind. The money that Bonsal had was Harrington's (or Harrington and McNeil's) money until he paid it to Bonsal, when it became Bonsal's money, unless he was a party to some fraud, which is not shown. The attorney's receipt, authorized and approved by Harrington, and not denied or questioned in any way, shows that the purchase was of certificates and not whiskey, and unless the court is compelled to hold that his statements, although contradicted by himself and the receipt of his attorney, as well as by the defendant, were sufficient to go to the jury, there was no legally sufficient evidence that whiskey, and not certificates, was sold by Bonsal to Harrington. There was nothing to show, or suggest, that Bonsal knew, if it was a fact, that Harrington had fraudulently or illegally collected the money or even where it came from. We do not think there was any legally sufficient evidence to go to the jury as to the purchase being one of whiskey and not certificates for whiskey in bond. When the only testimony offered on that point is shown by the witness' own evidence not to be true, and especially when that testimony is contradicted by a paper in evidence, executed by the witness' attorney and not questioned or denied

by the witness, surely the statement of the witness, thus contradicted, cannot properly be said to be legally sufficient evidence of this question to be submitted to the jury.

But even if it is a question for the jury, and if Harrington did purchase whiskey and not certificates, we cannot understand how that could entitle the plaintiff to recover in this case. Harrington was not suing, he was being sued. Even if it is possible for anyone to believe what Harrington said in conflict with the receipt, there is nothing in his evidence which authorized the plaintiff to sue Bonsal. There is no authority of which we are aware which would authorize a recovery. If A sells to B whiskey, or anything else, and B sells it to his various customers, and they pay him for it, but it is not delivered by B, a customer cannot sue A because B paid A, unless there is some proof that A was B's partner, or B was his agent, or in some way connected with him, other than merely as seller and buyer, and, of course, unless there was some kind of fraud which made him liable. There is no evidence of such in this case, and it seems to be unnecessary to cite authorities or further discuss such a plain proposition. The defendant's second prayer, which told the jury that there was no evidence legally sufficient to entitle the plaintiff to recover against the defendant Bonsal, and therefore their verdict must be for him, should have been granted, and it becomes unnecessary to consider other exceptions presented to us, as the judgment must be reversed without a new trial.

We have not thought it necessary to refer to the fact that there is not a particle of evidence to sustain the amended account as against Bonsal, in which it, as the bill of particulars then in the case, bases the right to recover on the alleged promise by defendants to return the purchase money to the plaintiff on his disaffirmance of the agreement.

*Judgment reversed without a new trial, the plaintiff to pay the costs.*